NOTICE: Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale. Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent. See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

25-P-376

CARE AND PROTECTION OF LATIFA (and a companion case[1]).

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

Following a trial, a Juvenile Court judge found that the mother was unfit to parent her two children and ordered entry of decrees terminating her parental rights to them. In a consolidated appeal from the decrees and from an order denying a motion to vacate the decrees, the mother contends that the evidence did not clearly and convincingly establish that she is currently unfit or that she will remain unfit to parent her children in the future. She further argues that termination of her parental rights was excessive and unnecessary where the judge ordered the Department of Children and Families (department) to create a reunification plan for the children

---

[1] Care and Protection of Annette. The children's names are pseudonyms.

with the father and also allowed the mother posttermination visitation. We affirm.

Background. In May 2022, the department filed a care and protection petition pursuant to G. L. c. 119, § 24, and the department received emergency custody of the two children named therein, Latifa and Annette. A trial on the merits was held over five days in July, August, and September 2023. We set forth the facts found by the judge after trial, saving some facts for later discussion.

The mother and the father were married in 2017. At the time of trial, Annette was eight years old, and Latifa was four years old. Although the mother and the father were still legally married at that time, the father filed for divorce in April 2023, and a judgment of divorce nisi since entered in the Probate and Family Court. The mother is diagnosed with mental health conditions and "alcohol dependence/abuse." She experienced postpartum depression following the birth of Latifa in May 2019. In 2020, during the COVID-19 pandemic, the mother and the father increased their consumption of alcohol. By October 2021, both drank alcohol on a daily basis, including in the presence of the children. Domestic violence was prevalent in their relationship, particularly when they consumed alcohol.

2

The department first became involved with the family in May 2020 when a report under G. L. c. 119, § 51A (51A report), was filed alleging neglect of the children by the mother and the father following a domestic disturbance in the family's home. Although the report was not substantiated, the investigation raised concerns about the mother's alcohol dependence and domestic violence in the couple's relationship. Multiple reports and investigations of domestic disturbances in the household followed. On Halloween night in 2021, the police responded to a residence following a report of a 911 hangup. After an officer saw a bruise on the mother's arm and a welt on her forehead, the mother stated that the father had physically and mentally abused her on a daily basis for the past three to four years. The police arrested the father for domestic assault and battery, the mother posted bail for him, and he returned to the family home. A 51A report was subsequently filed alleging neglect of the children due to the ongoing domestic violence between the mother and the father, and the department investigated and supported those allegations. Its investigation also raised concerns about the parents' truthfulness, substance abuse, domestic violence, and the mother's poor judgment.

The instability in the mother's life continued into 2022. In January, the police responded to a report of a domestic

3

disturbance at the family's residence. In February, the father was arrested for domestic assault, threat to commit a crime, and witness intimidation based on text messages he sent the mother. The mother obtained an abuse prevention order against him pursuant to G. L. c. 209A, § 3, on February 3, but asked the court to vacate the order on April 29. In March, the mother relocated with the children to a new residence with another man, with whom she had entered into a relationship. This relationship ended in May after an incident of domestic violence at the home in which the mother was the aggressor. The children were left in the second man's care after the mother was arrested. A 51A report was filed against both the mother and the second man regarding the incident and ultimately supported. The children were taken to their maternal grandfather's home. A few weeks later, the mother dropped the children off with the father in the morning, promised to return in an hour, but did not. With the assistance of the police, the father dropped the children off at the maternal grandfather's home in advance of his sober home's nightly curfew. A department worker then visited the maternal grandfather's home on an emergency basis and found the mother intoxicated and acting in an abrasive and aggressive manner. An emergency removal of the children was conducted on May 16, 2022.

Following the children's removal, the department developed action plans for the father and the mother to assist them in reunifying with the children and developing skills needed to provide for the children's safety and security. The mother's action plan required her to, among other things, attend parenting classes, engage in domestic violence services, engage in weekly counseling, refrain from substance use, participate in weekly substance treatment, engage in alcoholic's and narcotic's anonymous meetings ("AA" and "NA") at least twice a week, meet with the department each month, and obtain stable housing. The mother did not successfully complete most of these tasks. She did not consistently meet with the department on a monthly basis. She did not consistently engage in domestic violence services and lacked insight into the effects of domestic violence on the children and the "detrimental effect" of remaining in a relationship with the father. The mother largely attended visits with the children, but was late for several visits. She continued to use alcohol after the children's removal. She was admitted to a treatment center for alcohol dependency for approximately a week in May 2022, stayed at sober homes for the rest of 2022, then left those supports in February 2023 to move to a boarding home to be near the father. She relapsed on alcohol and opiates in April 2023, entered an

addiction treatment facility the following month, then entered a sober home where she remained during trial. The mother did not consistently attend weekly substance abuse treatment and counseling meetings, did not follow her relapse prevention plan, and did not consistently engage in AA meetings. The judge concluded that the mother "has not made a serious commitment to maintaining a sober lifestyle."

After the trial, the mother's rights were terminated. In March 2024, the judge issued findings of fact and conclusions of law in support of the decision to terminate the mother's parental rights. In her decision, the judge concluded that the department "sustained its burden of proving by clear and convincing evidence that [the mother] is currently unfit to further the welfare and best interest of [the children] and that her unfitness will continue for the indefinite future to a near certitude." The judge found that the department "sustained its obligation to make reasonable efforts" as to the mother,[2] and "that termination of her parental rights [was] in the children's best interests." As for the father, the judge concluded that although he "is presently unable and/or unavailable to assume

---

[2] We note that even though the judge found that "in totality" the department made reasonable efforts to assist the mother, it did not make efforts to assist her with housing.

6

parental responsibility for the children," his present unfitness was based on the department's failure to employ reasonable efforts to assist him in reunification. In particular, the judge found that "[b]oth prior to and following the removal," the father was "engaged in services designed to ameliorate the concerns with his parenting deficiencies," but the department was unwilling or resistant to assist him with housing. The judge ordered the department to create a reunification plan for the children with the father and provide a "30-day letter" to the father to allow him to obtain suitable housing for the children. The judge allowed the mother bimonthly visitation with the children after termination, with visits to be supervised by the department while the children remain in its custody and at a visitation center following their reunification with the father. The mother appealed from the decrees terminating her rights and also filed a motion for relief from the judgment pursuant to Mass. R. Civ. P. 60 (b), 365 Mass. 828 (1974), which a second judge denied.

Discussion. On appeal, the mother contends that the trial judge erred in finding that the mother is not currently fit to care for the children and that her unfitness will likely persist in the foreseeable future. "In deciding whether to terminate a parent's rights, a judge must determine whether there is clear

7

and convincing evidence that the parent is unfit and, if the parent is unfit, whether the child's best interests will be served by terminating the legal relation between parent and child" (citation omitted). Adoption of Patty, 489 Mass. 630, 637 (2022). "We give substantial deference to a judge's decision that termination of a parent's rights is in the best interest of the child, and reverse only where the findings of fact are clearly erroneous or where there is a clear error of law or abuse of discretion." Adoption of Ilona, 459 Mass. 53, 59 (2011).[3]

Here, the judge found the mother unfit due to a number of factors, including her failure to provide the children with a safe, stable environment free from substance abuse and domestic violence; failure to maintain a sober lifestyle; failure to follow action plans and attend necessary counseling and treatment programs; and failure to benefit from the services in which she engaged. The mother does not directly challenge the judge's factual findings as clearly erroneous. Rather, she contends that the determination of unfitness is inconsistent

---

[3] Although the mother acknowledges the substantial deference standard, much of her brief contends that we should instead apply strict scrutiny in this case. The mother does not cite any authority for this position other than a law review article, and we decline to depart from controlling precedent.

8

with the fact that her visits with the children "uniformly went well," and that the judge's findings regarding her character and temperament reflect an outdated "common scold view of women." We are not persuaded.

The judge found that, when the mother attended visits with the children after their removal, she was engaging and playful and she and the children reciprocated affection. At the same time, the mother had difficulty confirming her visits in advance, arrived late at several visits, and missed or canceled others. The judge concluded that the mother did not understand the children's needs for "a consistent, sober caretaker" and "placed her own needs above those of the children when she failed to visit instead opting to relapse on substances."

As for the mother's claim that the judge found her unfit based on archaic social norms about women "whose speech and emotions annoy the powerful," it has no basis in the judge's findings and conclusions. Rather, the judge properly focused on the mother's severe parental shortcomings and inability to protect the children from abuse and neglect. While the judge considered the mother's disruptive behavior at trial as a factor in assessing her credibility, the judge also noted that only the "endangerment of the child" warrants termination of parental rights because the State "does not act to punish misbehaving

9

parents."  See Adoption of Patty, 489 Mass. at 639.  In concluding that the mother was unfit based on her inability to provide for the children's needs, the judge took into consideration the mother's history of domestic violence, mental instability, substance abuse, and home environment, among other factors.  The judge's findings and conclusions are amply supported by the record.

Nor do we discern any error or abuse of discretion in the judge's conclusion that the mother's "unfitness will continue for the indefinite future to a near certitude."  See Adoption of Ilona, 459 Mass. at 60 ("Because childhood is fleeting, a parent's unfitness is not temporary if it is reasonably likely to continue for a prolonged or indeterminate period").  The judge found that the mother's life remained unstable; her home environment remained unsafe; and she failed to complete action plan tasks, embrace mental health or substance abuse counseling, or regularly visit the children.  She only sporadically engaged in domestic violence services, had not benefited from the services in which she engaged, and lacked insight into the effects of domestic violence on the children.[4]  Additionally, the

_____

[4] We recognize that there may have been reasons why the mother stayed in her domestic relationships despite the presence of violence.  See Commonwealth v. Gordon, 87 Mass. App. Ct. 322, 333 n.13 (2015).  At the same time, "a parent who continues to

10

mother's mental health conditions "inhibit[ed] her ability to assume parental responsibility for the children," and she had not been forthright in sharing information with her therapists. She also failed to consistently engage in substance abuse treatment and relapsed just months before trial, leading the judge to conclude that "her substance abuse will continue undiminished into the foreseeable future, placing the children's welfare at hazard." Although the mother did complete a twelve-week parenting class, she derived no tangible benefit from it.

The judge did not err in concluding that it was in the best interests of the children to terminate the mother's parental rights.[5] "While courts protect the rights of parents, the

_____

expose a child to an environment imbued with domestic violence endangers [the] child." Adoption of Arianne, 104 Mass. App. Ct. 716, 723 (2024).

[5] Contrary to the mother's suggestion that the "[s]ua sponte" termination of her parental rights was not "legally sound," the fact that this case began with a care and protection petition did not preclude the judge from entering decrees terminating the mother's parental rights. As the judge noted, the mother received in-hand service of the care and protection petition a few days after it was filed in May 2022. Consistent with G. L. c. 119, § 26 (b) (4), the summons gave explicit notice that a possible result of the proceedings was dispensation with the need for the mother's consent to adoption of the children and the termination of her parental rights. "The express language of G. L. c. 119, § 26 [b] (4), permits, and in some instances mandates, that the judge, upon a finding of the need of care and protection, consider and order the dispensation of the need for parental permission to adopt." Adoption of Donald, 49 Mass. App. Ct. 908, 909 (2000).

11

parents' rights are secondary to the child's best interests and . . . the proper focus of termination proceedings is the welfare of the child" (quotation and citation omitted). Adoption of Ilona, 459 Mass. at 61. The mother argues that termination of her parental rights was unnecessary because "[t]his is not an adoption case," since the judge did not terminate the father's parental rights. The mother does not challenge the children's reunification with the father, and asserts that placement with him "is a viable alternative to termination of [her] parental rights." It was within the judge's authority, however, to terminate the parental rights of one, but not both, of the children's parents. See Adoption of Willow, 433 Mass. 636, 645-647 (2001). Although the judge found the father "currently unfit to further the children's welfare and best interests as he lacks adequate housing despite his strenuous efforts to locate housing," she also found that his unfitness was temporary because "the Department has failed to make reasonable efforts to assist [him] in reunification." The father was largely compliant with his action plan, completed domestic violence prevention and anger management programs, consistently engaged in substance use treatment and mental health counseling, and remained sober through the proceedings. The judge contrasted the father's willingness and future ability to carry out his

parental responsibilities with the mother's failure to demonstrate "a substantial and permanent improvement in the issues that led to the filing of this petition."

Lastly, it was not inconsistent, much less error, for the judge to terminate the mother's parental rights while allowing her posttermination visitation with the children. A judge may "order limited post[termination] contact, including visitation, between a child and a biological parent where such contact is currently in the best interests of the child." Adoption of Vito, 431 Mass. 550, 553 (2000). Such an order "is grounded in the over-all best interests of the child, based on emotional bonding and other circumstances of the actual personal relationship of the child and biological parent, not in the rights of the biologic parent nor the legal consequences of their natural relation." Id. at 562. Here, the judge found that the mother and the children "appeared bonded" during the visits the mother attended and concluded that some posttermination contact and visitation between the mother and the children was in the children's best interests. The purpose of such contact and visitation "is not to strengthen the bonds between the [children] and [their] biological mother," but to

13

assist the children as they negotiate the transition to a more stable home environment.  Id. at 564-565.

Decrees affirmed.

Order denying motion to
  vacate decrees affirmed.

By the Court (Blake, C.J.,
  Hand & Toone, JJ.[6]),

*Paul Little*

Clerk

Entered:  March 5, 2026.

---

[6] The panelists are listed in order of seniority.